606 So.2d 387 (1992)
Louis LeWINTER, Appellant,
v.
The GUARDIANSHIP of Louis LeWINTER, Appellee.
No. 92-386.
District Court of Appeal of Florida, Third District.
September 1, 1992.
Zemel and Kaufman and Franklin Zemel, Miami, for appellant.
Frederick C. Sake, Miami Beach, for appellee.
Before SCHWARTZ, C.J., and HUBBART and BASKIN, JJ.
*388 SCHWARTZ, Chief Judge.
At the end of a proceeding instituted by a financially dissatisfied adopted son, the trial court determined that ninety-four-year-old Louis LeWinter was incapable of fully exercising his rights to manage his property and to consent to medical treatment, §§ 744.3215(3)(d), (f), Fla. Stat. (1991), and appointed a guardian to perform those functions for him. See § 744.331(6), Fla. Stat. (1991). We reverse because there is no competent evidence to support the order.
The record of the adjudicatory hearing contains no expert or other testimony that Mr. LeWinter then lacked the capacity to perform the functions referred to in the order.[1] Neither of the grounds relied on for the contrary position by the appellee, which is ironically the guardianship of the appellant himself, supports its position. First, the report of the examining committee established under section 744.331(3)(a), which did contain such findings, but which was filed over six weeks before the hearing,[2] was rendered entirely valueless by the admitted fact that Mr. LeWinter's condition had markedly improved in the meantime. See Bludworth v. Bray, 59 Fla. 437, 52 So. 957 (1910); Golden Glades Regional Medical Ctr. v. State, Health Care Cost Containment Bd., 586 So.2d 422 (Fla. 3d DCA 1991). Second, the trial judge's own opinion that the ward was incapacitated by lapses of attention and memory[3] is a mere non-expert conclusion entitled to no evidentiary weight. See Bergman v. Serns, 443 So.2d 130 (Fla. 3d DCA 1983), pet. for review dismissed, 450 So.2d 486, 488 (Fla. 1984). (It is also directly contrary to LeWinter's own statements in the record before us.) While the trial court may, indeed must, determine the credibility and weight of the evidence, it is not empowered to create that evidence from the whole cloth.
It is thus apparent that the order below, with its profound effect upon the appellant's privacy and dignity, is unsupported by the clear and convincing evidence required by section 744.331(6). See Slomowitz v. Walker, 429 So.2d 797 (Fla. 4th DCA 1983). It is accordingly reversed and the cause remanded with directions to dismiss the proceeding.
Reversed.
BASKIN, J., concurs.
HUBBART, Judge, dissenting.
I regret that I cannot join the court's opinion in this case because, in my view, the court has impermissibly substituted its judgment for that of the trial court by reweighing and reevaluating the evidence in the record on appeal. The Florida Supreme Court in Shaw v. Shaw, 334 So.2d 13 (Fla. 1976) states the controlling law:
"It is clear that the function of the trial court is to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor and credibility of the witnesses appearing in the cause. It is not the function of the appellate court to substitute its judgment for that of the trial court through reevaluation of the testimony and evidence from the record on appeal before it. The test, as pointed out in Westerman, supra, is whether the judgment of the trial court is supported by competent evidence. Subject to the appellate court's right to reject `inherently incredible and improbable testimony or evidence,' it is not the prerogative of an appellate court, upon a de novo consideration of the record, *389 to substitute its judgment for that of the trial court."
Id. at 16 (footnote omitted). It seems clear to me that today's decision cannot be squared with these well-established principles of appellate review.

I
In the instant case, on September 9, 1991, Norman LeWinter[4] filed (1) a verified petition to determine whether his 94-year-old adoptive father, Louis LeWinter, was mentally and physically incapacitated, and (2) a verified petition for the appointment of an emergency temporary guardian for Louis LeWinter. The court appointed a committee of two doctors and a lay person to examine Louis LeWinter, who in turn examined Louis LeWinter on September 10, 1991, and promptly filed a report containing their findings. On September 13, 1991, the court conducted a hearing on the petition for the appointment of a temporary guardian at which Norman LeWinter and Louis LeWinter were present, represented by respective counsel. At the hearing, Louis LeWinter's counsel suggested that the court appoint a temporary guardian to marshal and manage Louis LeWinter's assets. (R.130). After this suggestion was explained to him (R.130-31), Louis LeWinter expressly agreed to the appointment of a temporary emergency guardian for sixty (60) days. (R.131). Based on the committee's report and the agreement of Louis LeWinter and his counsel, the court on September 13, 1991, appointed Abraham Galbut as a temporary guardian for Louis LeWinter for a period of sixty (60) days to "arrange for his care and to preserve, protect, assemble, and inventory his property." (R.8). The court then arranged to have Louis LeWinter transferred from The Miami Jewish Home and Hospital, where he was staying, to his apartment on Miami Beach, as Louis LeWinter requested.
Sixty days later, on November 14, 1991, the consented-to temporary guardianship came to an end, and, accordingly, the court conducted a second hearing in the case so as to resolve the pending petition to determine incapacity. The committee's report was received in evidence pursuant to section 744.331(3)(c), Florida Statutes (1991), which provides that such report must be filed with the court and that such report "should be an essential element, but not necessarily the only element, used [by the court] in making a capacity and guardianship decision." The report contains an overall diagnosis of Louis LeWinter, namely, "[s]enile [d]ementia ([m]ild)." (R.10). In particular, the report states:
"Physical Examination: 94 year old white man appearing his stated age, ambulatory and in no acute distress.
Mental Health Examination: Alert and cooperative. Mild memory impairment. Thoughts are well organized. Adequate judgement. Slight cognitive impairment, eg. difficulty with proverbs and abstract thinking.
Functional Assessment: Able to aid and assist counsel. Unable to give medical consent. Ambulates with a cane and needs some assistance adult daily living functions.
... .
The respondent did not seek medical attention when his health was failing. He acknowledged signing papers presented by his son and an unknown female attorney without understanding the content of the papers. His funds are currently managed by others although he related that he trusts his accountant and attorney. He had some difficulty with recent memory eg. dates. He stated very strongly that he did not want his son involved in the management of his affairs. In general his thinking was well organized but there was some difficulty with abstract thinking that would preclude involvement with business matters."
(R.12, 13). The report concludes that Louis LeWinter was not able "to make informed *390 decisions regarding his right to contract" or "his right to consent to medical treatment," (R.11), but that in all other respects he was able to make informed decisions in his life. See § 744.3215(2), (3), Fla. Stat. (1991). Attached to the report were two addendums from Dr. Albert Jaslow and Mr. Joseph McNulty. Dr. Jaslow was of the view that Louis LeWinter was also unable to make informed decisions regarding his right "to sue, or assist in the defense of suits of any nature against him" or "to manage property or to make any gift or disposition of property." (R.11, 15). Mr. McNulty stated that "[i]n my opinion I believe Mr. LeWinter to be incapacitated  plenary"; in support of this opinion, Mr. McNulty states:
"He was able to answer some simple question however he was confused on others.
His nurse indicated he needs 24 hr supervision, she said he is confused at times. He insists that he should be able to go home. She also said she needs to walk with him, she's afraid he may fall.
I talked to Dr. Shapiro at the Jewish Home and he indicated Mr. LeWinter has dementia, he needs 24 hour care, is unable to make rational decisions.
I would recommend he be allowed to live at his condo at 2301 Collins Ave. with 24 hr. supervision. He claims his son is pressuring him for money."
(R.16).
The two lawyers representing Louis LeWinter argued at the outset of the November 14, 1991 hearing that the committee report was, in effect, stale because it was contended that Louis LeWinter had improved tremendously since the filing of the report approximately sixty (60) days before, and that the report did not establish by clear and convincing evidence that Louis LeWinter was partially mentally incapacitated (R.39D, 39E-39H, 39J). Counsel for Louis LeWinter, however, offered no testimony or evidence to support their assertions of mental improvement, although the trial court specifically offered to hear any such proofs (R.39F-39G); counsel also expressly declined the court's offer to have Louis LeWinter reexamined (R.39J). Consequently, the only evidence adduced at the hearing was the committee report which the court found established by clear and convincing evidence that Louis LeWinter was mentally incapacitated to make certain informed decisions in his life. (R.39DD). Based on this ruling, the trial court on November 15, 1991, reappointed Abraham Galbut as a temporary guardian for Louis LeWinter for sixty (60) additional days (R.9). On January 7, 1992, the trial court entered a final order of limited incapacity determining that Louis LeWinter was mentally incapable of exercising the right to contract, to make large gifts, to determine medical treatment, and to determine daily care  as to which an appointed limited guardian was to exercise such rights for him. (R.159). On the same date, the trial court reappointed Abraham Galbut[5] as the limited guardian in this case. (R.156).

II
As the court correctly acknowledges, the report of the examining committee fully supports the court's orders creating a limited guardianship in this case. An extended discussion of why this is so seems entirely unnecessary as the report, together with the addendums of Dr. Jaslow and Mr. McNulty, speak for themselves. The court, nonetheless, rejects the committee report because "it was rendered entirely valueless by the admitted fact that Mr. LeWinter's condition had markedly improved in the meantime"  i.e., since the filing of the report approximately sixty days prior to the hearing. Maj.Op. at 388. No evidence, however, was ever introduced below which established that Louis LeWinter's condition had "markedly improved" from the date of the committee report; nor was this ever an "admitted fact" at the hearing, as no stipulations or admissions were ever made by the petitioner Norman LeWinter at any time in this case. Moreover, the trial *391 judge, time and again, noted for the record that Mr. LeWinter had memory lapses and could not follow what was going on at the hearing. The trial judge did note that Mr. LeWinter's condition had "improved" since the last hearing, but clearly stated "he is not able to handle his entire affairs because of his memory lapses." (R.39K). One such memory lapse noted by the court (R.39H) was that at the outset of the hearing, Mr. LeWinter did not even know who his own lawyers were, even though he had previously consulted with them, and mistakenly thought that Norman LeWinter's counsel might be his lawyer. (R.39C). Plainly, there is nothing in this record which establishes the "admitted fact" on which the court bases its entire decision.
Nor am I impressed with Louis LeWinter's argument on appeal that the committee report was legally "stale" because a hearing was not held on the report within fourteen days after the filing of the report as required by section 744.331(5)(a), Florida Statutes (1991), "unless good cause is shown." "Good cause" was obviously shown in this case because, at a hearing held within days after the committee report was filed, both Louis LeWinter and his counsel expressly agreed to a 60-day temporary guardianship in this case  which necessarily extended the final hearing in the case by sixty days, at which time such a hearing was promptly held. Moreover, counsel for Louis LeWinter never asked for an earlier hearing nor did he object to the hearing which was held; the point is simply an appellate afterthought. Counsel also refused the trial court's offer to have Louis LeWinter reexamined.
In sum, it is clear that this court has simply reweighed and reevaluated the weight of the evidence in the record and has impermissibly substituted its judgment for the trial court. It was for the trial court, not this court, to evaluate the weight of the committee report in this case  and that report, in my view, clearly supports the orders under review. See Westerman v. Shell's City, Inc., 265 So.2d 43 (Fla. 1972); Brandenburg Inv. Corp. v. Farrell Realty, Inc., 463 So.2d 558, 560 (Fla. 2d DCA 1985); Bowles v. D. Mitchell Inv., Inc., 363 So.2d 1106, 1110 (Fla. 3d DCA 1978). I would affirm these orders in all respects.
NOTES
[1] It is not disputed that he was fully capable of exercising each of the other rights referred to in sections 744.3215(2), (3), Fla. Stat. (1991).
[2] It is unnecessary to pass upon the ward's alternative claim that reversal is required by the violation of the requirement of section 744.331(5)(a) that the adjudicatory hearing be set and held "no more than 14 days after the filing of the report ... unless good cause is shown," which it was not.
[3] For example, the record contains the following:

THE COURT: You see, Counsel, we are going from one thing to another, and I am convinced that, I want the record, so the Third District knows it, that Mr. LeWinter, in my opinion, cannot follow what is going on.
[4] The court in its opinion refers to Norman LeWinter as "financially dissatisfied" Majority Op. at 388. There is nothing in the record, however, to support this charge other than Louis LeWinter's unsworn meandering statements to the trial court, statements which the trial court clearly rejected as unfounded.
[5] Both Louis LeWinter and his counsel acknowledged below that Mr. Galbut was a capable, sensitive, and disinterested guardian  although, of course, they resisted the appointment of any guardian at all on a permanent basis.