LAGOA, J.
Frances L. Losh (“Losh”) appeals the trial court’s order determining limited incapacity. We reverse and direct the trial court to restore Losh to her full capacity.
I. FACTUAL HISTORY
Losh is a ninety-three-year-old widow. She has one child, the appellee Carlin McKinley (“McKinley”), who lives in Washington State. In the fall of 2010, Losh fell at home and broke her tailbone. She believed that she had bruised her tailbone and did not think it was necessary to see her doctor. She continued her normal daily activities, but subsequently was hospitalized. Losh returned to her home in late December 2010. Once home, Losh had twenty-four-hour help from a certified nursing assistant. Losh also paid for McKinley to come to Miami and help her.
McKinley spent approximately ten days in Miami, but refused to stay in Losh’s home. During this period, Losh was in a somewhat weakened condition after having spent the last sixty-plus days in a hospital or rehabilitation facility. She also was taking a number of different medications.
On January 5, 2011, McKinley filed a Petition to Determine Incapacity. The court appointed a three-member examining committee comprised of David Eeha-varria, Ph.D., Addys Prieto, Psy.D., and Lloyd Miller, M.D. Both Dr. Prieto and Dr. Miller recommended no guardianship, having found Losh “quite able to make her own decisions” and with her “insight and judgment intact,” respectively. Dr. Echa-varria was the only committee member to find Losh “partially oriented.”
On February 9, 2011, McKinley moved to strike the examining committee’s report. It is unclear from the record if this *1152 motion was heard or ruled on by the trial court or the magistrate. Nonetheless, it is clear from the record that on March 7, 2011, the trial court entered an order discharging Dr. Miller, as a conflict of interest arose, and appointing Dr. Alfred Jonas, M.D. as the third examining committee member. As a result, the trial court entered an order for an amended second evaluation.
On March 4, 2011, Dr. Prieto re-examined Losh and recommended no guardianship. In her report, Dr. Prieto noted that Losh was oriented as to person, place and time. She was able to name three major current event issues and reported that she managed her own financial affairs. Medically, Losh reported a decrease in her falls, improved health, and continual twenty-four-hour care. The report also noted that there were no apparent hallucinations or delusions, and Losh’s judgment and insight were good.
Dr. Echavarria re-examined Losh on March 5, 2011, and recommended a limited guardianship. In his report, Dr. Echavar-ria noted that Losh was oriented with mild deficits of cognition and judgment. She was able to provide basic information and was able to name the president. He reported that she was unable to name her medications or reasons for taking them, and related “delusions” about McKinley. Dr. Echavarria also noted that Losh needs help in managing finances and affairs.
Dr. Jonas examined Losh on March 20, 2011. In his report, he recommended a limited guardianship only as to Losh’s ability to manage property or make gifts. In his report, Dr. Jonas noted that Losh was alert, fully oriented, “very well aware of circumstances,” and that she had excellent general knowledge. Losh’s memory was generally excellent. Dr. Jonas noted that Losh knew her monthly income and expenses but she could not remember or rather, would not divulge the names of her banking institutions. Dr. Jonas also noted that Losh disapproved of McKinley’s handling of her financial affairs.
At a hearing on April 27, 2011, the trial court heard the testimony of Dr. Echavar-ria, Dr. Prieto, and Dr. Jonas. The court also heard the testimony of McKinley, and two bankers — Amy Vargas and Mireya Batista.[1]
When the hearing resumed on May 3, 2011, Losh testified in detail about her family, personal finances, property, health status, and prescribed medications. Specifically, Losh testified regarding her three different bank accounts, why she had money in three separate banks rather than one, and why she chose money market accounts over certificates of deposit. She described all of her real estate, and explained that she did not carry insurance on some of the properties because “I have enough money to cover any damage.” She testified that on occasion she has someone else write a check for her because her hands can shake too much. She knew how much her monthly expenses are and what she pays each of her nurses or caretakers. She reconciles her checkbook monthly, and indeed, even keeps a separate ledger, as she has for the past sixty-four years, of every payment that she makes. She also was able to describe the medicines that she takes, and her medical conditions. As to her daughter, McKinley, Losh described the large sums of money she has given to her in the past and testified that every *1153 time McKinley has asked her for money she has given it to her.
At the conclusion of the hearing, the trial court expressed concern about Losh’s “vulnerability to what we call undue influence” and further stated that “there’s some evidence that there might be an issue with your ability to, you know, handle everything that you have to going forward.” The trial court thereafter entered its order determining limited incapacity.
As examples of Losh’s incapacities, the trial court in its written order cited to the fact that Losh delayed medical treatment for her broken tailbone and for her cataracts. The trial court also found that Losh has a diminished ability to manage her finances and assets. In reaching this conclusion, the trial court relied upon the following facts: on more than one occasion, she has been late in paying her credit card bill; she has intentionally not carried liability insurance on improved, unencumbered real estate; she keeps money in lower interest rate money market accounts rather than seeking the higher interest rate of a certificate of deposit and other people sometimes write checks for Losh to sign, and once someone other than Losh signed a check.
As a result, the trial court determined that Losh is incapable of exercising almost all of her rights, including the ability to manage property or to make any gift or disposition of property, and her ability to consent to invasive medical and mental health treatments. The trial court only allowed Losh to retain her right to vote, determine her residency, spend up to $1,500, and fire her caregivers. Any replacement caregivers, however, would have to be hired and supervised by the guardian.
II. ANALYSIS
Under the Florida guardianship statutes, before depriving an individual of all of his or her civil and legal rights, “the individual must be incapable of exercising his rights at all, whether wisely or otherwise.” McJunkin v. McJunkin, 896 So.2d 962, 963 (Fla. 2d DCA 2005). The record shows that here, the evidence presented to the trial court fell far short of the clear and convincing standard necessary to support a finding that Losh is incapable of exercising her rights. See § 744.331(5)(c), Fla. Stat. (2011) (“[T]he partial or total incapacity of the person must be established by clear and convincing evidence.”); Graham v. Fla. Dep’t of Children & Families, 970 So.2d 438 (Fla. 4th DCA 2007) (reversing and remanding with directions to dismiss guardianship proceeding where record evidence failed to establish ward’s incapacity by clear and convincing evidence); LeWinter v. Guardianship of LeWinter, 606 So.2d 387 (Fla. 3d DCA 1992) (reversing and remanding with directions to dismiss guardianship proceeding where order determining incapacity was unsupported by clear and convincing evidence).
Dr. Prieto found Losh fully oriented to person, place, and time, and also aware of the legal proceedings concerning her. Indeed, Dr. Prieto noted that upon this reevaluation she found no deterioration in cognitive function, and that Losh appeared “more relaxed, wittier and physically stronger.” Her report recommended removing none of her rights. And although Dr. Jonas recommended a limited guardianship, he recommended that her rights be restricted only as to her right to manage property or to make any gift or disposition of property. The most convincing evidence of Losh’s capacity, however, was the testimony of Losh herself, who revealed herself to be coherent and fully aware of her circumstances, both financially and medically.
*1154 Moreover, the bases stated by the trial court in its order determining limited incapacity are completely insufficient to justify a finding of incapacity. For example, it is not indicative of incapacity for a ninety-three-year-old woman to have her money in liquid money market accounts rather than long-term certificates of deposit subject to penalties for early withdrawal. Nor is the fact that Losh chooses not to carry liability insurance on some of her unencumbered properties, or that she sometimes asks a caregiver to write out a check for her, competent evidence to support the order.
The trial court appears to have been motivated out of a concern for Losh’s ability to make decisions in the future because of various family issues and the fact that she is surrounded by caregivers, rather than family. While the trial court’s action was well intentioned, it is nevertheless true that “[i]n our present day paternalistic society we must take care that in our zeal for protecting those who cannot protect themselves we do not unnecessarily deprive them of some rather precious individual rights.” In re Maynes-Turner, 746 So.2d 564, 565 (Fla. 3d DCA 1999) (quoting In re McDonnell, 266 So.2d 87, 88 (Fla. 4th DCA 1972)).
Because there was not clear and convincing evidence of Losh’s incapacity sufficient to justify the removal of her rights to the extent contained in the order determining limited incapacity, we reverse and remand with instructions to restore Losh to her full capacity and dismiss the guardianship proceeding.
Reversed and remanded.

. There is no transcript of the April 27th hearing. The record on appeal contains the medical records of Dr. Castanes, dated from a period of March 2, 2010, through January 27, 2011. Dr. Castanes noted that Losh was alert, and oriented as to person, place and time. He did not find any distress or cognitive disorder.